IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KELVIN L. DRUMMOND,                    *

     Plaintiff,                            *

v.                                     *              Civil Action No. GLR-19-836

WARDEN JOHN S. WOLFE,                  *
EASTERN CORRECTIONAL INST.,
and GWENDOLYN WRIGHT, CO II,[1]        *

     Defendants.                           *

                                 ***

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Eastern Correctional Institution, Warden John S. Wolfe, and CO II Gwendolyn Wright's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 16).[2] This matter is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will grant Defendants' Motion, which it construes as a motion for summary judgment.

---

[1] The Court will direct the Clerk to add Officer Wright's first name to the docket.

[2] Also pending before the Court are Plaintiff Kevin L. Drummond's Motions for Appropriate Relief (ECF Nos. 21 & 22) and Motion for Discovery (ECF No. 24). For the reasons explained below, Drummond's Motion for Discovery will be denied.

As for Drummond's Motions for Appropriate Relief, these requests are based on Drummond's purported efforts to work with a lieutenant at Eastern Correctional Institution to informally resolve his claims, and to enlist the Court's assistance in ensuring the proposed agreement is honored. The Court is not a party to the agreement, nor does it appear the agreement was in fact successfully executed by Drummond and the lieutenant. Accordingly, the Motions for Appropriate Relief (ECF No. 20, 21) will be denied.

## I.    BACKGROUND

Plaintiff Kevin L. Drummond is an inmate incarcerated at the Eastern Correctional Institution ("ECI") in Westover, Maryland. According to Drummond's Verified Complaint, on September 24, 2016, Correctional Officer Gwendolyn Wright grabbed him in a "very aggressive manner" while trying to move him. (Compl. ¶ 7, ECF No. 1). Drummond alleges that he was then retaliated against when he filed a complaint against Wright pursuant to the Administrative Remedy Procedure ("ARP"). (Id. ¶¶ 8, 10). Further, he alleges that on October 15, 2016, Wright once again attempted to intimidate and retaliate against him, even though she had "already been prohibited from working in the housing unit" where Drummond was housed. (Id. ¶ 10). Drummond filed his Complaint against Defendants on March 19, 2019. (ECF No. 1). Drummond seeks declaratory relief and compensatory and punitive damages against Wolfe and Wright in their official and individual capacities. (Compl. ¶ 2).

With his Complaint, Drummond provides a copy of an ARP dated September 24, 2016 ("ARP ECI-2142-16"). In it, Drummond alleges that he was standing on the tier when Wright ordered him, in a "very heated way," to go to his cell because he was not permitted to eat there. (Compl. Attach. 1 ["ARPs"] at 2, ECF No. 1-1). Wright walked towards him in an "aggressive way" and "grabbed" his arm, "yanking" him towards the stairs. (Id. at 4). Drummond contends that by approaching him in an "aggressive" manner, Wright violated Drummond's "personal space, thereby battering me, by physically grabbing me." (Id. at 3). Drummond states that Wright released him after he asked her several times to do so. (Id. at 2). Drummond does not allege that he sustained any injuries.

2

As for Wright's version of events, Wright avers that she noticed Drummond sitting on a milk crate on the tier below eating a bowl of cereal. (Defs.' Mot. Dismiss Alt. Summ. J. ["Defs.' Mot."] Ex. 3 ["Wright Decl."] ¶ 4, ECF No. 16-4). According to Wright, inmates on that tier are not permitted to eat on the tier floor. (Id.). Wright told Drummond that he was prohibited from eating on the tier floor and was "out of bounds" because he was sitting too close to Wright's desk. (Id.). Wright gave Drummond a direct order several times to return to his cell on the upper tier or go to the dayroom. (Id.). Only after Wright issued the third and final order did Drummond stand up and begin walking to the stairs to return to his cell on the upper floor. (Id.). As Drummond walked up the stairs, Wright heard him say to other inmates, "I'm writing an ARP on her." (Id.).

Wright denies grabbing Drummond's arm or yanking him toward the stairs during this incident. (Id. ¶ 6). According to Wright, the only physical contact she may have had with Drummond was when she was ordering him to return to his cell or go to the day room, as she was pointing in either direction and may have inadvertently brushed his upper arm or shoulder with her index finger. (Id. ¶ 7). Wright states that "otherwise [she] did not make any physical contact with [Drummond] whatsoever." (Id.). Further, Wright states that in accordance with her training and the relevant security procedures, she "would not have escalated the situation by forcefully taking [Drummond's] arm in that situation"; rather, when an inmate physically or verbally disobeys direct orders, she calls for assistance on her radio. (Id. ¶ 6). Additionally, Wright explains that the glass enclosed Control Center for that tier, where the Officer in Charge was stationed, was approximately ten feet from where Drummond and Wright were located when she ordered him to either go to his cell

or to the day room. (Id.).

Drummond filed a second ARP ("ARP ECI-2143-16"), also dated September 24, 2016, in which he alleges that an hour after the first incident and Drummond's submission of ARP ECI-2142-16, Wright came by his cell, said she smelled wine, and accused him of making wine in his cell. (ARPs at 6–7). Drummond informed her that he had three oranges in his cell, which were part of his kosher meals that he saves for when he gets hungry throughout the day. (Id. at 7). Wright ordered Drummond to discard the fruit, and he complied. (Id.). Drummond alleges Wright's actions were intended to harass and intimidate him as a form of retaliation for filing ARP ECI-2142-16. (Id.).

Wright denies retaliating against Drummond in any manner. (Wright Decl. ¶ 10). Wright states that she was conducting routine tier rounds approximately thirty minutes after her first interaction with Drummond when she walked by his cell and smelled wine. (Id. ¶ 8). Wright observed Drummond alone in his cell sitting on the lower bunk and told him to throw away the wine. (Id.). Drummond replied that it was just oranges, pointing to a small garbage can filled with approximately one dozen whole and sliced oranges. (Id.). According to Wright, inmates are not permitted to have that amount of fruit in their cell because it can be fermented into contraband alcohol. (Id.). Wright also explains that inmates on that tier are served their meals in their cells. (Id. ¶ 9). Drummond was receiving kosher meals at that time, but Wright recalls that fruit was not necessarily served at every meal, and if fruit was included in a kosher meal, only one piece of fruit was included. (Id.). Wright states that, in any event, inmates are not permitted to collect and store oranges in

their cells. (Id.).[3]

Pursuant to Wright's order, Drummond dumped the oranges into a garbage can on the tier floor. (Id. ¶ 8). After Drummond discarded the oranges, he asked Wright if she was going to write him a ticket for violating inmate rules. (Id. ¶ 10). Though it was within the officer's discretion to ticket Drummond for eating on the tier, disobeying direct orders, or accumulating fruit in his cell, Wright informed him that she would not to do so. (Id.).

On October 3, 2016, Drummond was visited by a nurse at the request of corrections staff following his September 24, 2016 allegation of assault. (Defs.' Mot. Ex. 5 ["Medical Records"] at 2, ECF No. 15-6). Drummond told the nurse that Wright had grabbed his right upper arm. (Id.). Drummond denied having any injuries and the nurse noted no sign of injury on Drummond. (Id.).

Also attached to the Complaint is a third ARP ("ARP ECI-2282-16") dated October 15, 2016. In the ARP, Drummond asserts that on October 15, 2016, he was standing on the tier when Wright came by, stopped near him, motioned for another inmate to come over to

---

[3] Drummond's Complaint does not allege any constitutional violation as it relates to his kosher meal. However, on January 2, 2020, Drummond submitted to the Court a copy of an ARP dated December 12, 2019, which complained that Drummond's kosher meals are "lacking" and too often include cottage cheese, evidencing a pattern of arbitrary treatment to discourage access to religion. (See ECF No. 19-1). To the extent Drummond intends to assert a new claim, he may not do so in his Opposition. See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314 (11th Cir. 2004) (emphasizing that the "liberal pleading standard" of Rule 8 "does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage"); see also Myland Labs., Inc. v Akzo, N.V., 770 F.Supp. 1053, 1068 (D.Md. 1991) (stating "it is axiomatic that the complaint may not be amended by briefs in opposition to a motion to dismiss"); Zachair Ltd. v. Driggs, 965 F.Supp. 741, 748 n.4 (D.Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), aff'd, 141 F.3d 1162 (4th Cir. 1998).

her, leaned over to the other inmate and "'whispered' something to him in a conspiratorial secretive way," and then stared intensely at Drummond with a "smug-look" on her face. (ARPs at 11–12). Drummond contends that Wright's "impermissible" behavior amounted to an implied threat. (Id. at 12). Drummond alleges Wright's behavior and "implied threat" violates rules and regulations and is unbecoming of a correctional officer. (Id.). Additionally, Drummond states that at the time of this incident, Wright had been "prohibited from working" on Drummond's tier. (Compl. ¶ 10).

Wright acknowledges that she was no longer assigned to Drummond's housing unit by October 15, 2016. (Wright Decl. ¶ 12). However, Wright states that her assignment to a new housing unit was not the result of disciplinary action, nor was she disciplined in any way for her conduct in handling incidents with Drummond. (Id. ¶ 11). Further, Wright does not "specifically recall" whether she was at Drummond's housing unit on October 15, 2016, and states that the "only interaction" she had with Drummond was during the time she was assigned to his housing unit. (Id. ¶ 12). Wright does not recall any further interaction with Drummond after that. (Id.). Wright asserts that she "definitely did not whisper conspiratorially to another inmate" in front of Drummond "as a way to intimidate or threaten" him and denies attempting to threaten or intimidate Drummond in any way. (Id.).

In addition to his allegations against Wright, Drummond claims that Warden Wolfe[4] failed to respond to ARPs ECI-2142-16, ECI-2143-16, and ECI-2282-16. (Compl. ¶¶ 9,

---

[4] Warden Wolfe retired in January 2018 after forty years of state correctional service. (Defs.' Mot. Ex. 4 ["Wolfe Decl."] at 1, ECF No. 16-5).

10). In response, Warden Wolfe avers that when responding to an ECI inmate's ARP complaint, he "relied on the review and investigations by staff to render a response." (Defs.' Mot. Ex. 4 ["Wolfe Decl."] at 4, ECF No. 16-5). Drummond's ARP requests were procedurally dismissed pending the results of an investigation by the Intelligence and Investigative Division ("IID"). (Defs.' Mot. Ex. 2 ["IID Case No. 16-35-2000"] at 2, ECF No. 16-3). Subsequently, IID "pulled the case number due to lack of information indicating that COII Wright was intentionally trying to injure Inmate Drummond rather than performing her duties." (Id.). No Use of Force investigation or Serious Incident Report was generated as a result of the alleged incident on the housing unit tier on September 24, 2016. (Defs.' Mot. Ex. 1 ["Schumaker Decl."] ¶ 3, ECF No. 16-2).

## II.     DISCUSSION

### A.     <u>Standard of Review</u>

#### 1.     Conversion

Defendants style their Motion as a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the Alternative, for Summary Judgment under Rule 56. A motion styled in this manner implicates the Court's discretion under Rule 12(d). See <u>Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty.</u>, 788 F.Supp.2d 431, 436–37 (D.Md. 2011), <u>aff'd</u>, 684 F.3d 462 (4th Cir. 2012). Rule 56 provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion

and rely on it, thereby converting the motion, or to reject it or simply not consider it.'"

Wells-Bey v. Kopp, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013)

(quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004,

2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two

requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice

and a reasonable opportunity for discovery. See Greater Balt. Ctr. for Pregnancy Concerns,

Inc. v. Mayor of Balt., 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly

captions its motion "in the alternative" as one for summary judgment and submits matters

outside the pleadings for the court's consideration, the parties are deemed to be on notice

that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464

(D.Md. 2005). The Court "does not have an obligation to notify parties of the obvious."

Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 261 (4th Cir. 1998).

Ordinarily, summary judgment is inappropriate when "the parties have not had an

opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus.,

Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment

'cannot complain that summary judgment was granted without discovery unless that party

had made an attempt to oppose the motion on the grounds that more time was needed for

discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir.

2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir.

1996)). To raise sufficiently the issue that more discovery is needed, the non-movant must

typically file an affidavit or declaration under Rule 56(d) explaining the "specified reasons"

8

why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d). A Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (quoting Young v. UPS, No. DKC-08-2586, 2011 WL 665321, at *20 (D.Md. Feb. 14, 2011)). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 953 (4th Cir. 1995)).

Here, Drummond was on notice that the Court might resolve Defendants' Motion under Rule 56 because Defendants captioned their Motion in the alternative for summary judgment and filed it together with a declaration and verified exhibits for the Court's consideration. Although Drummond did not file a Rule 56(d) affidavit, on June 8, 2020, Drummond filed a Motion for Discovery seeking discovery relating to: all incident reports written against him; previous complaints or law suits filed "against the Defendant"; all "in-house" complaints filed against "the Defendant," including ARP complaints; the history of "Defendant's" training record; and any settlement agreements made by "the Defendant." (Pl.'s Mot. Discovery at 2, ECF No. 24). Drummond, however, fails to explain why the discovery he seeks is critical to demonstrating a genuine dispute of material fact or refuting Defendants' exhibits and declarations. As such, Drummond has failed to identify specific reasons why more time is needed for discovery as required by Rule 56(d). Accordingly, the Court will deny Drummond's Motion for Discovery and treat Defendants' Motion as one for summary judgment.

### 2.    Summary Judgment

Summary judgment is governed by Federal Rule of Civil Procedure 56(a), which provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. Rather, "[b]y its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48 (1986).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" <u>Bouchat v. Balt. Ravens Football Club, Inc.</u>, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed.R.Civ.P. 56(e)), <u>cert. denied</u>, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inference s in her favor without weighing the evidence or assessing the witnesses' credibility." <u>Dennis v. Columbia Colleton Med. Ctr., Inc.</u>, 290 F.3d 639, 644–45 (4th Cir. 2002); <u>see</u> <u>FDIC v. Cashion</u>, 720 F.3d 169, 173 (4th Cir. 2013).

### B.    <u>Analysis</u>

Defendants argue they are entitled to summary judgment on Drummond's claims because the Eleventh Amendment bars suits against ECI and Wolfe and Wright in their

official capacities; Warden Wolfe had no personal participation in the alleged events; and Wright's actions do not amount to harassment or retaliation. The Court addresses these arguments in turn.

### 1.    Eleventh Amendment

To sustain an action under 42 U.S.C. § 1983, a plaintiff must demonstrate that: (1) the plaintiff suffered a violation of a right secured by the Constitution or laws of the United States; and (2) the act or omission causing the deprivation was committed by a person acting under color of law. West v. Atkins, 487 U.S. 42, 48 (1988). Importantly, however, "[u]nder the Eleventh Amendment, a private individual is barred from bringing a suit against a state in federal court to recover damages, unless the state consents or there is an exception to sovereign immunity. See Coleman v. Court of Appeals of Md., 556 U.S. 30, 35 (2012); Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54–55 (1996). While the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, see Md. Code Ann., State Gov't § 12-201(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court.

Absent waiver or a valid congressional abrogation of sovereign immunity, sovereign immunity also bars suit against an instrumentality of a state, sometimes referred to as an "arm of the state." See Pennhurst State Sch. and Hosp. v. Halderman, 465 U.S. 89, 101–02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."). ECI is part of the Maryland Department of Public Safety and Correctional Services, which is a "principal department of the State government." Md. Code Ann., Corr.

Servs. § 2-101. Because ECI is an arm of the State of Maryland, it is not a "person" within the meaning of §1983. Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). Thus, the claims against ECI are barred by the Eleventh Amendment and must be dismissed. See, e.g., Lattisaw v. E. Corr. Inst., Civil Action No. CCC-15-2040, 2016 WL 3940186 (D.Md. July 21, 2016) (dismissing claim against ECI under principles of Eleventh Amendment immunity).

Further, claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state itself. See Brandon v. Holt, 469 U.S. 464, 471–72 (1985). Accordingly, the claims for monetary damages against Warden Wolfe and Officer Wright in their official capacities must be dismissed.

### 2. Personal Participation

It is well established in the Fourth Circuit that respondeat superior is not a recognized theory of liability under § 1983. See Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691(1978)). Instead, § 1983 requires a showing of personal fault based upon a defendant's personal conduct. See Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977). Thus, to state a supervisory capacity claim, a plaintiff must allege: (1) the supervisor had actual or constructive knowledge a subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to plaintiff, (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization; and (3) there was an affirmative causal link between the supervisor's inaction and the constitutional injury.

Shaw v. Stroud, 13 F.3d 791, 798–99 (4th Cir. 1994). Importantly, without subjective knowledge, a prison official is not liable. Farmer v. Brennan, 511 U.S. 825, 846 (1994); see Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998); see also Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009) ("[A] denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983.").

Here, Drummond's claim against Warden Wolfe is that he failed to respond to his ARP requests. Drummond does not allege that Wolfe had actual or constructive knowledge of Wright's conduct, nor does Drummond allege facts sufficient for this court to plausibly infer Wolfe's personal participation. Consequently, the claims against Wolfe in his individual capacity must be dismissed.

### 3.        Eighth Amendment

The Eighth Amendment to the U.S. Constitution proscribes punishments that involve "unnecessary and wanton infliction of pain." Gregg v. Georgia, 428 U.S. 153, 173 (1976); see Estelle v. Gamble, 429 U.S. 97, 102 (1976). To establish an Eighth Amendment violation, an inmate must demonstrate both that a prison official subjectively "acted with a sufficiently culpable state of mind" and that the injury or deprivation inflicted was objectively serious enough to constitute a violation. Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996).

To satisfy the objective requirement, a party asserting an excessive force claim must demonstrate that the officer used a "nontrivial" amount of force. Wilkins v. Gaddy, 559 U.S. 34, 39 (2010). "[N]ot 'every malevolent touch by a prison guard gives rise to a federal

cause of action.'" Id. at 37 (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1992)). As such, a "push or shove" without any resulting discernible injury almost always fails to state a claim for excessive force because the Eighth Amendment's prohibition of cruel and unusual punishment "necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Wilkins, 559 U.S at 38 (quoting Hudson, 503 U.S. at 9).

As for the subjective element, an inmate must show that the prison personnel used force "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline." Hudson, 503 U.S. at 6 (quoting Whitley v. Albers, 475 U.S. 312, 320–21 (1986)). In this analysis, a court should consider: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response." Iko v. Shreve, 535 F.3d 225, 239 (4th Cir. 2008) (quoting Whitley, 475 U.S. at 321) (internal quotation marks omitted).

In the present case, Drummond alleges that Wright ordered him in a "heated way" and approached him in an "aggressive manner." However, verbal abuse of inmates by guards, without more, does not establish an Eighth Amendment violation. Henslee v. Lewis, 153 F. App'x 178, 180 (4th Cir. 2005); see also Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979). Further, although Drummond states that Wright "grabbed" his arm and "yank[ed]" him in the direction of the stairs, there is no evidence in the record that Drummond suffered any physical injuries from these actions. Additionally, the evidence in

the record suggests that Wright's alleged use of force against Drummond was for the purpose of maintaining discipline, as it was meant to move him after he failed to obey Wright's direct orders. Notably, Drummond does not dispute that he initially refused Wright's direct orders to return to his cell.[5] According to Drummond's account, the alleged use of force was also brief, and Wright released him when Drummond asked her to let go. In all, the record shows that Wright used, at the very most, a non-trivial amount of force, which was reasonable in light of the circumstances. There is no evidence in the record that would allow this Court to draw an inference that Wright's conduct was malicious or sadistic and intended to cause Drummond harm. Even when viewing the evidence in the light most favorable to Drummond, the record shows that Wright's conduct does not amount to use of excessive force in violation of the Eighth Amendment. Accordingly, Wright is entitled to summary judgment in her favor.

### 4.    Retaliation

Drummond's allegations regarding Wright's conduct after Drummond filed ARP ECI-2142-16 are most fairly construed as a claim of retaliation for exercising his First Amendment right to petition for the redress of grievances. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v.

---

[5] Instead, Drummond questions why Wright did not issue him a ticket if he had failed to follow orders. (Pl.'s Opp'n at 5, ECF No. 18). To the extent Drummond may fault Wright for failing to follow institutional policy or procedure by issuing him an inmate rule violation, his allegations do not state a federal claim.

McGrow, 202 F.3d 676, 685 (4th Cir. 2000). "[A] prison inmate retains those First Amendment rights that are not inconsistent with the status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). Thus, an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. Booker v. S. Carolina Dep't of Corrs., 855 F.3d 533, 545 (4th Cir. 2017). To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that: (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the plaintiff's First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. See Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005).

Drummond attempts to characterize Wright's enforcement of institutional housing policies—in this case, Wright's order for Drummond to throw away the oranges he was storing in his cell—as an adverse retaliatory action. In the prison context, a plaintiff must establish that the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution or was not narrowly tailored to achieve such goals. See Rizzo v. Dawson, 778 F.2d 527, 532 & n.4 (9th Cir. 1985). The preservation of internal order and discipline constitutes a legitimate goal of the correctional institution. Id. at 532. Here, ECI imposes limits on fruit in prisoner's cells due to concerns about the potential for making contraband alcohol. Drummond's cache of oranges in his cell exceeded these limits. Wright's request for Drummond to dispose of the oranges not only advanced the goal of preventing the production of contraband, but was also narrowly tailored to achieve that

16

goal. Thus, this action does not support a claim for First Amendment retaliation. Likewise, Drummond's allegation that Wright engaged in "conspiratorial whispering" with another inmate on October 15, 2016 is also insufficient to support an inference of retaliation. Because there was a legitimate reason for Wright's disciplinary action regarding Drummond's oranges, and because the other allegations against Wright do not amount to retaliatory conduct, Drummond's retaliation claim is defeated. Accordingly, summary judgment will be granted in favor of Wright as to Drummond's retaliation claim.

### III.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 16) will be granted. A separate Order follows. Entered this 28th day of September, 2020.

_____/s/_____
George L. Russell, III
United States District Judge